[Civil No. 4303. Filed May 20, 1941.]

[113 Pac. (2d) 640.]

STATE TAX COMMISSION OF THE STATE OF ARIZONA and D. C. O'NEIL, THAD M. MOORE and C. WARREN PETERSON, as Members of said State Tax Commission, Appellants, v. C. M. MARTIN, Appellee.

Mr. Joe Conway, Attorney General, and Mr. Earl Anderson, Special Assistant Attorney General, for Appellants.

Messrs. Baker & Whitney, Mr. Lawrence L. Howe and Mr. Harold E. Whitney, for Appellee.

McALISTER, J.—This action was filed by C. M. Martin against D. C. O'Neil, Thad M. Moore and C. Warren Peterson, as members of the tax commission of Arizona, to recover $18,392.60 paid by him under protest in accordance with the provisions of the Excise Revenue Act, Code, 1939, § 73–1301 et seq. Judgment in favor of the plaintiff in the amount sought with interest was rendered and the tax commission appeals.

The facts out of which the action grows are substantially as hereinafter stated. From May 1, 1935, until the date of the trial appellee, C. M. Martin, was engaged in the wholesale hardware, farm supply, gasoline and lumber business at 1821 East Jackson street, Phoenix, where he has a number of buildings, one of which is a large structure facing north and divided by an east-west partition running almost through its center. The portion south of the partition is occupied by appellee and that north of it by the United Producers & Consumers Co-operative, a corporation, which will be referred to hereafter as the Co-op. Appellee's office and that of his office manager and accounting force is in the part of the building occupied by him near the partition and all the space south or back of this office is a warehouse where goods are received, uncrated and placed on shelves. He has other warehouses, however, east and west of this building and across the street from it.

The Co-op is a nonprofit organization incorporated in 1934 by five persons engaged in agricultural pur-

suits. It has no capital stock and those wishing to become members of it do so by paying the membership fee of fifty cents fixed by the association's by-laws for which they are issued a certificate of membership entitling the holder to purchase goods from it at cost, and at the time of the trial about 11,700 persons had become members of the organization. It was organized originally to purchase gas and oil at wholesale for the purpose of resale to its members at cost plus the expense of handling. To begin with it rented from appellee a tank in which to store its gas for distribution to its members and also space for its office. It had no money with which to start this venture, so appellee extended it credit, and after its first annual meeting he and the board of directors agreed that he should buy other commodities in large quantities and sell them to the Co-op at wholesale prices for resale by it to its members for cost plus overhead and, according to the testimony, from that time on this was done. Appellee was not an officer of the Co-op and had no connection with it other than the advancement to it of credit with which to do business, except that he leased to it for $100 per month three business places, namely, the north half of the large structure just mentioned, one across the street for the service department, and one to the east for the lumber department.

In the portion of the building north of the partition the Co-op has its office, a "bull-pen" for the cashier and a cash register, and shelves and counters on which goods are displayed. This merchandise is the property of appellee and is taken from the warehouse and placed on the shelves and counters by his employees who keep stock records of it, so as to know for insurance purposes how much he has there and how much in the warehouse. These goods are sold by the Co-op to its members in this way: When a member enters

the Co-op's place of business and purchases an article of merchandise the clerk serving him makes out a sales ticket showing whether the purchaser is a member, his name, his Co-op number, the date, amount paid and the description of the merchandise, marks it "paid," all sales being for cash, and turns it into the Co-op's cashier. At the close of the day the Co-op's bookkeeping department segregates the sales tickets into different classes of commodities for which the Co-op has a classification, there being nine in all, for instance, all tickets on gasoline sales being placed in one class, those for hardware in another, those for kerosene in still another, etc., totals them, and the next morning issues a purchase order for them and turns it over to C. M. Martin, wholesaler, stating that the goods have been purchased for resale. The purchase order does not list the individual sales but groups the various commodities according to the different classifications. Upon receipt of the purchase order, appellee makes out a bill for the goods included therein and delivers it to the Co-op, both the purchase order and the bill being for the goods the Co-op sold the previous day. Upon receipt of the bill from appellee the Co-op posts the purchases in its purchase journal as a permanent record of accounts payable and about every other day pays appellee on account, there being at all times a balance due him.

After giving the foregoing testimony as to the manner in which the wholesale business between appellee and the Co-op was transacted, Harlan Russell, office manager for appellee, testified as follows on cross-examination:

"Q. Now, assume, Mr. Russell, that I was a member of the Co-operative during the period that is involved in this lawsuit, and I wanted to buy any article, say a pair of irrigating boots, and went to the Co-operative for them, those boots there in stock would

be Charlie Martin's boots, wouldn't they? A. Yes, sir.

"Q. And the Co-operative would sell them to me although they belonged to him, that is true, is it? A. The merchandise would be there on hand.

"Q. The merchandise would be in the Co-operative's place of business, that is true? A. It would be on display, yes, sir.

"Q. But nevertheless, it would be Mr. Martin's merchandise? A. Yes, sir.

"Q. That is true all right? A. Until the sale is made.

"Q. All right. Now, I buy the pair of boots, for example, and I pay for them, and the Co-operative delivers them to me, that is right, isn't it? A. Yes.

"Q. Then the next morning they give Mr. Martin a purchase order for them? Is that right? A. Yes, sir.

"Q. Now, I will ask you if under your theory of accounting a sale of boots, the illustration I gave, would not amount to a sale to me before you had ever purchased the boots, before the Co-op had ever purchased the boots from Mr. Martin? A. We—they issue us a purchase order the following morning and then we bill them for the merchandise.

"Q. In any event, the property that they sell me, the boots in this instance, are Mr. Martin's at the time they sell them to me, isn't that true? A. At the time, until the merchandise is sold.

"Q. Surely, yes, and that applies to any other purchase from the Co-operative, they are selling Mr. Martin's property? A. Yes, sir.

"Q. That is true, isn't it? A. Each case would, I imagine, be similar if that is what you have reference to.

"Q. During this whole period that is involved in this controversy now, you understand the period to be from May 1st, 1935, to July 31st, 1937, and from November the 1st, 1938, to January 31st, 1939, the Co-operative owned no stock, it was all Martin's? A. That is right."

The witness, in referring to the display room from which the Co-op sells, stated that "Mr. Martin sells merchandise for resale in there to other dealers than the Co-operative" and that "that is our display for wholesale sales."

According to the witness, W. G. Ashby, secretary-treasurer of the Co-op since its organization, and in charge of its accounts and bookkeeping system, these purchases are made by the Co-op from appellee for the purpose of resale and no goods are purchased by the Co-op from anyone other than appellee whose sales to the Co-op constituted ninety-five per cent. of his wholesale business, the remaining five per cent. being made to 173 other persons, firms or corporations.

The evidence discloses that the goods, wares and merchandise purchased from appellee by the Co-op in the manner described from May 1, 1935, to July 31, 1937, aggregated $786,004.67 and that those purchased from November 1, 1938, to January 31, 1939, amounted to $223,370.59, a total of $1,009,375.26 for these thirty months. During this period, or from May 1, 1935, to June 11, 1937, when Chapter 2, First Special Session of the Thirteenth Legislature, abolishing the tax on sales at wholesale, became effective, appellee reported the sales he made to the Co-op as sales at wholesale and paid thereon each month the tax of one-fourth of one per cent. which amounted altogether to $1,723.83. The difference between the retail tax on $1,009,375.26 and the wholesale tax on the sales to the Co-op up to June 11, 1937, after making an allowance for an error of a few dollars, is $18,392.60, the amount paid by appellee under protest and sought to be recovered by him in this action.

The goods purchased from appellee by the Co-op from May 1, 1935, to July 31, 1937, aggregating $786,004.67, were resold by it at wholesale and retail in such amounts that it paid a wholesale tax of $126.67

and a retail tax of $14,790.98, or a total of $14,917.65. The Co-op did not cease paying the tax on sales to its members on July 31, 1937, but continued to do so for six months or until January 31, 1938, when it was advised by the director of the sales tax division of the tax commission, acting upon an opinion of the attorney general, that under the Co-operative Marketing Act, Code 1939, § 49–701 et seq., it was not liable for the tax on sales to its members.

It will be observed that the tax on the income from the Co-op's sales from August 1, 1937, to November 1, 1938, is not involved in this action, and the reason for this is that during these fifteen months the Co-op owned the goods it sold, the record disclosing that its daily indebtedness to appellee on account of inventory amounted to $75,000 or $80,000. But on November 1, 1938, it turned all this merchandise back to appellee and was given credit for it on his accounts receivable and from then on they did business with each other in the same way they had prior to August 1, 1937, because it avoided losses caused by fluctuation in prices of merchandise and was less expensive; that is, the Co-op issued each day one purchase order to cover the goods purchased the previous day and appellee immediately made out and delivered to it a bill for this merchandise, a payment thereon being made about every other day.

In 1937 the tax commission had an audit made of the business transacted by appellee with the Co-op from May 1, 1935, to May 31, 1937, and it disclosed that appellee had sold to the Co-op during this period goods aggregating $655,960.49. Acting upon this report, the commission on August 4, 1937, by virtue of section 14 of the Excise Revenue Act, Code 1939, § 73–1315, entered an order in writing reassessing appellee with an additional wholesale tax in the sum of $402.13 for this period, and this was paid by appellee

under protest, though all of it except $149.71 was later found to be an error.

On July 19, 1939, the tax commission made an order that the taxes paid by appellee on the goods sold to the Co-op during the periods May 1, 1935, to July 31, 1937, and from November 1, 1938, to January 31, 1939, which had been classified by him in his returns to the commission as sales at wholesale, should have been classified as sales at retail and, acting upon this finding and pursuant to the authority of subsection (a), section 14 of the Excise Revenue Act, assessed against appellee an additional privilege sales tax in the sum of $18,392.60. This was paid under protest and the purpose of this suit is to recover it.

The court heard the case without the aid of a jury and, after considering it for some time, came to the conclusion that the facts, which were undisputed, sustained the allegations of the amended complaint and entitled appellee to judgment for a return of the $18,-392.60 he had paid under protest. Whether this action was based on the proposition that appellee's sales to the Co-op were sales at wholesale, in which event he was not subject to the retail tax, or upon the contention that appellants were estopped from assessing an additional privilege sales tax against him because it had theretofore accepted his tax on these sales as a wholesaler, or both, does not appear from the judgment and there were no findings. In his brief appellee contends that the judgment is sound under either theory, but the position of appellants is that it may stand under neither because the undisputed evidence shows, first, that the Co-op was merely the agent of appellee for selling merchandise and that all sales made by it were in fact sales by and for appellee, and, second, that it took the merchandise on consignment to be sold by it as his agent.

■■ The only error assigned is that for the two reasons given the judgment is contrary to and not supported by the evidence. There can be no question but that the goods, wares and merchandise sold by the Co-op during the period involved were at the time they were sold the property of appellee. All the evidence is to this effect. Appellee placed these goods on the shelves and counters of the Co-op's salesroom to be sold by the Co-op mostly at retail and by appellee at wholesale, and the Co-op neither purchased nor paid for them prior to their sale and delivery. The title to them remained in appellee until it passed directly from him to the consumer through the agency of the Co-op, there being no period of time whatever when it rested in the Co-op. The issuance by the Co-op to appellee of a purchase order for these goods, wares and merchandise and the delivery to it by him of a bill for them, both acts being performed after the goods had been sold and delivered and title to them passed to a third person, could not by any stretch of the imagination have the effect of vesting title to the goods in the Co-op at any stage of the transaction. The only possible conclusion to be drawn from the facts is that the goods were in the salesroom of the Co-op to be sold by it as the agent of appellee and, hence, that they were there simply on consignment from appellee. This being true, the Co-op was merely the agent of appellee for selling the goods, the title to which he had retained until he transferred it to the consumer through his agent. ''A consignment of goods for sale,'' to use the language of the *Rio Grande Oil Co.* v. *Miller Rubber Co. of New York,* 31 Ariz. 84, 250 Pac. 564, 565, ''does not pass the title at any time, nor does it contemplate that it should be passed. The very term implies an agency, and that the title is in the consignor, the consignee being his agent.'' *Commercial Securities Corp.* v. *Babbitt Motor Co.,* 36 Ariz.

438, 286 Pac. 820; 15 C. J. S., Consign, 988, first paragraph.

Inasmuch, therefore, as the goods, wares and merchandise were never sold to the Co-op but were placed in its salesroom by appellee to be sold by it as his agent to ultimate consumers, it follows necessarily that he was liable for the 2% tax imposed by the Excise Revenue Act on the income from retail sales. A sale of his merchandise through an agent rendered him no less subject to the tax than he would have been had he made the sale himself.

The facts show that the Co-op paid a tax of $14,917.65 on sales made by it from May 1, 1935, to July 31, 1937, and, inasmuch as these were payments by the agent of a tax the principal, appellee, should have made, the tax commission concedes that he is entitled to credit for them in determining the exact status of his sales tax account. To hold otherwise would be equivalent to permitting the collection of the 2% tax twice on the same sale.

The Co-op voluntarily paid the sales tax on its retail sales from May 1, 1935, until the director of the sales tax division of the tax commission was advised by the attorney general under date of February 18, 1938, that it was not liable for this tax under section 49–720, Arizona Code of 1939, of the Co-operative Marketing Act. If the Co-op was not subject to the tax, this meant that from then on the state would receive neither a wholesale nor retail tax on the income from the sale of these goods, because the wholesale tax, which appellee had paid on the goods sold to the Co-op up to June 11, 1937, was not collectible after that date, having been abolished by the Thirteenth Legislature at its first special session, and the Co-op, a nonprofit corporation organized under the Co-operative Marketing Act, was not liable for the retail tax on its sales. The value of the goods sold by the Co-op

each year amounted to several hundred thousand dollars, so, after looking into the matter further, the tax commission came to the conclusion that the Co-op was not a purchaser of these goods at all but merely appellee's agent in selling them to the ultimate consumer and, therefore, liable for the retailer's tax thereon. Having reached this conclusion, it entered the order of July 19, 1939, directing appellee to pay the retail tax on the goods sold by the Co-op from May 1, 1935, to July 31, 1937, and from November 1, 1938, to January 31, 1939, and appellee contends that it is estopped from doing this, because of its order of August 4, 1937, assessing him an additional wholesale tax of $402.13 on sales to the Co-op from May 1, 1935, to May 31, 1937, following an audit theretofore made by it showing that he lacked that much of paying the full amount due. He takes the position that this order, made after a hearing, adjudged appellee's business to be wholesale and assessed against him an additional tax, that it was final and that the tax commission, the additional tax having been paid, could not make another and different determination of the character of the tax and assess an additional tax on the same personal property covering the same period of time. No question was raised in that hearing, so far as the record discloses, as to whether appellee should pay a wholesale or retail tax and, naturally, there was no occasion to determine the matter. The attorney general had not then ruled that the Co-op was not liable for the retail tax and appellee had paid the wholesale tax from the beginning, the audit having been made merely to ascertain whether he had paid the proper amount, not whether he should have paid instead the retail tax which was then being paid by the Co-op. If he had made a mistake in computing the tax assessable against him as one-fourth of one per cent., when it should have been two per cent., and it is plain that he

had, the method of correcting this error was to be found in section 14 of the Excise Revenue Act which provides that "the commission shall correct such error or re-assess the proper amount of taxes and notify the taxpayer of this action by mailing to him promptly a copy of the corrected assessment, and any additional tax for which such taxpayer may be liable shall be paid within ten (10) days after the receipt of such statement." It is plain that estoppel has no application in this situation.

The judgment is reversed.

LOCKWOOD, C. J., and ROSS, J., concur.