In the Matter of **GROSS MFG. & IMPORTING CO., Inc.**, a corporation of the State of New Jersey, Bankrupt.

No. B.803–68.

United States District Court,
D. New Jersey.

July 16, 1971.

Allan L. Tumarkin, Newark, N. J., for trustee and pro se.

Arthur H. Miller, New Brunswick, N. J., for claimant.

## MEMORANDUM

AUGELLI, Chief Judge:

This matter is before the Court on petition of the Trustee in Bankruptcy for review of an order of the Referee, filed on August 4, 1970, which allowed the proof of claim of Estey Musical Instrument Corporation, the major creditor (hereinafter Estey), for $50,473.28 and dismissed the objections of the bankrupt, Gross Mfg. & Importing Co., Inc. (hereinafter the bankrupt or Gross), thereto as well as dismissing the Trustee's counterclaim for $26,049.93, based on certain inventory of the bankrupt which was alleged to have been fraudulently or preferentially returned to Estey. A hearing to review the Referee's order was held before this Court. Decision was reserved to permit the Court to consider certain evidence in the form of invoices which were before the Referee but inadvertently not offered in evidence.

The briefs, supplemental briefs, transcripts and exhibits have been carefully examined in light of General Order 47, which provides that:

> Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

This Order was considered in In re Steiker, 380 F.2d 765, 767–768 (3 Cir. 1967), wherein it was observed:

> We recently noted in In re Rubin, 378 F.2d 104 (C.A. 3, 1967), that the mandate of General Order 47 precludes this court as well as the district court from not accepting the referee's basic findings of fact. See In re Wolf, 165 F.2d 707, 709–710 (C.A. 3, 1948). Though ultimate findings are subject to appellate scrutiny free of the "clearly erroneous" rule, as was noted above, those findings should be undisturbed where they are supported by the underlying factual determinations which cumulatively satisfy the applicable standard of proof.

Cf. In re Pioch, 235 F.2d 903 (3 Cir. 1956), wherein it was held that there was insufficient proof for the Referee's decision on the ultimate finding. See also 2 Collier, Bankruptcy, § 39.28 (14th Ed. 1970). Of course, the Court is not restricted by General Order 47 in relating the Referee's findings of fact to the ultimate conclusions of law.

The bankrupt was "\* \* \* in the business of wholesale dealing in musical instrument supplies and related products \* \* \* for approximately forty-six years." It filed a Petition for an Arrangement under Chapter XI on May 28, 1968. However, Gross was adjudicated a bankrupt on December 3, 1968, because of "\* \* \* having failed to proceed with the plan." During its long existence Gross dealt as a distributor for, among others, a sequence of supplier entities which used variations of the name "Estey", but only the "Estey" corporation which commenced dealings with the bankrupt after mid-1967 is the creditor herein involved. Any testimony about a course of conduct between the bankrupt and any other "Estey" must be scrutinized in light of which entity was conducting business at that time.\* The creditor herein was formed on July 14, 1967. At that point no debts were owed to the new Estey. Its dealings with Gross were subsequently conducted in light of the prior trade difficulties with the predecessor Estey companies and Gross's deteriorating reputation. Just prior to the time that Messrs. Green and Knazick formed the new Estey, Green had heard from Mr. Wolf, then secretary-treasurer and Vice-president of the bankrupt, that " \* \* \* the condition of Gross Manufacturing was very bad."

---

\* Estey's brief explains the sequence of its predecessors' various forms. Sometime around 1957 Estey Piano Corporation, the original old firm, merged with Organ Company of America which was owned by four persons including Stanley Green and Saul Knazick, who later became stockholders in the creditor claimant corporation. After some acquisitions its name was changed to Estey Electronics, Inc. That corporation had financial reverses and filed a proceeding under Chapter XI of the Bankruptcy Act in 1962 and thereafter was declared bankrupt. Its major creditor, Textile Banking Corporation of New York, formed The Estey Musical Instrument Corporation, and continued the business of the prior bankrupt corporation, from 1962 until July 14, 1967, when Mr. Green and Mr. Knazick purchased a substantial part of the corporation including its name but not its accounts receivable. Apparently a new corporation was then formed with the same name, and the prior corporation's name was changed to J.H.S. Corporation, which retained the accounts. Debts under those accounts were paid by Gross; so neither Textile nor J.H.S. is a creditor herein. Pursuant to a subsequent merger Estey is now part of Electro-Learner Corporation which is not a claimant herein but is one of the parties against which the counterclaim is asserted.

On August 1, 1967 (within the first two weeks of business between Estey and the bankrupt), Mr. Wolf acting as secretary-treasurer and *executive* vice-president of the bankrupt, and Mr. Knazick, as executive vice-president of Estey, executed a consignment agreement for the protection of Estey. It was stipulated that no financing statement was executed or filed pursuant to the Uniform Commercial Code. Estey also required personal notes from Mr. Wolf upon delivery of merchandise to the bankrupt and billed Gross for the merchandise as well. Sixty-seven duplicate invoice forms were submitted to this Court and were marked in evidence without objection as they had been used but not marked during the Referee's hearing. Those invoices as well as notes signed by Mr. Wolf and an accounts receivable ledger indicate the nature of the course of dealing between the bankrupt and Estey, which was pursued in addition to the consignment agreement, and give the appearance of creating a debtor-creditor relationship, as well as that of consignor-consignee. The terms of the consignment agreement itself bear upon the ostensible method of dealing. The body of the consignment agreement is as follows:

All merchandise which we shall deliver to you is delivered exclusively on consignment and subject to sale by you to others. Title to all such merchandise shall remain with us until its resale by you and any unsold merchandise in factory original sealed cartons may be returned to us at any time. Merchandise returned not in original sealed cartons shall be adjusted for service, handling, and packaging before credit is issued.

In the event of the resale by you, as our distributor, to retail establishments, you shall remit payment of any such items to us not later than thirty (30) days after such sale.

For the purpose of our own bookkeeping, we intend to invoice you for any deliveries we make to you at our agreed prices. Payment of such invoices, however, are subject to the resale of the merchandise so delivered to you, in accordance with the terms of this letter agreement.

Between August 1, 1967, and sometime in April, 1968, business was conducted between the two parties as indicated by the invoices. In April 1968 (the exact date is unclear), Gross returned to Estey merchandise with an invoice value of $26,049.93 either for repairs or for return under the consignment agreement. The Petition for Arrangement was filed on May 28, 1968. Estey issued a credit memorandum for the returned goods dated June 3, 1968. The delay in issuing the memorandum was alleged to be due to the fact that the goods had to be inspected so that deductions could be made for return freight, repair, handling, and repackaging under the terms of the consignment agreement. (An exhibit in evidence reflects a $6,289.89 charge including estimated repair costs.)

The Referee made the following findings of fact:

1. On or about July 17, 1967 Gross Manufacturing & Importing Co. Inc. (Gross) commenced buying musical instruments and supplies from Estey Musical Instrument Corporation (Estey). The sales during July were on open account, and were all paid in the regular course of business.

2. The balance-sheet position of Gross at this time left much to be desired. Estey was unwilling to deliver on open account the volume Gross required. However, Estey was willing to send on consignment the volume of merchandise Gross wanted.

3. On or about August 1, 1967 Gross and Estey entered into a written consignment agreement. Barry Wolf, in charge of the financial affairs of Gross, had full authority to represent Gross in this transaction.

4. Thereafter all shipments by Estey to Gross were made under the consignment agreement, with title remaining in Estey until resale of the merchandise by Gross to others.

5. The parties did not execute a financing statement for filing under the provisions of the Uniform Commercial Code.

6. In view of the inadequate financial condition of Gross, Estey also required negotiable promissory notes, signed by Gross, and by Barry Wolf personally, in connection with invoices for all shipments made after August 1, 1967.

7. The financial condition of Gross worsened. Commencing in January, 1968 many notes were dishonored when presented for payment. During all of 1968 the liabilities of Gross exceeded its assets.

8. In the latter half of April, 1968 Gross, on the initiative of Barry Wolf, returned to Estey most of the merchandise which previously had been delivered on consignment and had not been sold to customers. The merchandise so returned had an invoice value of $26,049.93.

9. On May 28, 1968 Gross filed its petition for an arrangement under Chapter XI of the Bankruptcy Act, and subsequently was adjudicated bankrupt.

10. On June 3, 1968 Estey issued a credit memorandum to Gross for $19,760.04. This was arrived at by deducting the following three items from the $26,049.93 invoice value of the returned merchandise: freight—$795.41, cartons—$494.48, and repairs—estimated at $5,000.00.

11. Subsequently Estey realized approximately $20,000.00 on resale of the merchandise returned by Gross.

Based on the foregoing findings of fact, the Referee made the following conclusions of law:

The consignment agreement of August 1, 1967 is valid. Title to merchandise returned by Gross to Estey in April, 1968 had always remained in Estey and had never been transferred to Gross. Therefore, since the return did not involve assets of Gross, there

was no preference or fraudulent transfer.

Giving full credence to the testimony of Saul Knazick, I find that the charges for freight, cartons and repairs were reasonable even though, in the circumstances, the figure for repairs had to be an estimate.

Even if the Referee's findings of fact are not "clearly erroneous" it still remains for the Court to determine the soundness of the legal conclusions reached.

The legal effect of the consignment agreement must be viewed in light of the change in the law brought about by § 2–326 of the Uniform Commercial Code. That section was enacted in both Pennsylvania, the place of the execution of the consignment agreement, and New Jersey. No one herein has argued that law other than that of New Jersey controls the effect of the consignment. The statute provides:

N.J.S.A. 12A:2–326. Sale on Approval and Sale or Return; Consignment Sales and Rights of Creditors.

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

\* \* \* \* \* \*

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsec-

tion are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Chapter on Secured Transactions (Chapter 9).

Certainly the elements of subsection (3) relating to delivery "to a person for sale, * * * [maintaining] a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery", have been satisfied by the method of dealing of the bankrupt, thus causing the goods to be held on sale or return. The Referee found, and the parties also stipulated, that there was nothing filed to make subsection (3) inapplicable under exception (c); nor was there any testimony that exception (a) was attempted to be complied with even if it applies in New Jersey; nor was it established that "the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others", which would entitle the bankrupt to an exception under (b). Vonins, Inc. v. Raff, 101 N.J.Super. 172, 182, 243 A.2d 836, 840 (App.Div.1968).

█ From the comments to § 2–326 of the Code, and other scholarly commentary in that area, it can be seen that the purpose of subsection (3) was to apply to " * * * cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation." (Official Comment to 2–326 at ¶ 2). See Shanker, Bankruptcy, and Article 2 of the Uniform Commercial Code, 40 Journal of the National Conference of Referees in Bankruptcy No. 2, Reprinted in 89 N.J.L.J. 648, at 648 (1966).

The basis for this hostility to consignment arrangements from the bankruptcy courts is fairly obvious. Regardless of the legal theory of the consignment, in practical operation it looks like a sales transaction in which the unpaid seller retains a secret lien in his goods. From a creditor's point of view, the consigned goods appear to be part of the regular inventory of the consignee which, therefore, ought to be subject to their claims. What is more, unlike a pre-code chattel mortgage, there is no public filing or other notoriety respecting the consignment to warn the creditors that the consignor may have rights in the goods which are superior to theirs.

The Code drafters were apparently much impressed that the consignment situation could be terribly misleading to creditors of the consignee. So, while the Code permits the consignment transaction to continue, it declares that the consignment will be valid as against creditors only if there is some way by which creditors can learn of the consignment.

See also King, Voidable Preferences and the Uniform Commercial Code, 52 Cornell L.Q. 915 (1967).

The case of Vonins, Inc. v. Raff, supra, is instructive as to the manner in which the New Jersey courts interpret § 2–326. In that case goods on the premises of the debtor at the time of an assignment for the benefit of creditors were held subject to claims of the creditors which were superior to those of the supplier of the goods even though there was an agreement which purported to reserve title.

Therefore, subsection (3) of N.J.S. 12A:2–326 is to be construed so as to resolve all reasonable doubts concerning the nature of a commercial transaction in favor of general creditors

of one who is deemed a "buyer" in a "sale or return" situation. As against such creditors neither the form of the relevant agreement nor the words used therein are controlling. * * * In furtherance of this policy, subsection (1) of the statute establishes a presumption that a "sale" to a "buyer" for resale purposes is a "sale or return." * * * Under subsection (2) of the statute, goods held by a "buyer" pursuant to such a transaction became subject to the claims of the "buyer's" creditors. [Citations omitted.] Vonins, Inc. v. Raff, at 179, 243 A.2d at 840.

■ Therefore goods in the possession of a consignor, under the factual setting required by subsection (3) and not excepted by one of the three methods proposed, are subject to the claims of the creditors of the consignee. General Electric Co. v. Pettingell Supply Co., 347 Mass. 631, 199 N.E.2d 326 (1964); Guardian Discount Co. v. Settles, 114 Ga.App. 418, 151 S.E.2d 530 (1966); In re Bro Cliff, Inc., Bankruptcy No. 33,884 (W.D.Mich. filed Sept. 25, 1970), reported in 8 U.C.C.Rep.Serv. 242; Annot. 17 A.L.R.3d 1010, 1127–1129 (1968). However, that is only part of the greater issue raised by this case. That issue is: Assuming a valid but unfiled consignment, does the return of the goods delivered pursuant to that agreement, which by law are on "sale or return", within four months before the filing of the petition in bankruptcy by the consignee constitute a voidable preference under section 60 of the Bankruptcy Act? That issue is raised and discussed (without case citations) in Bender, U.C.C. Service, Vol. 1 § 10.05 [3] (1969 ed.), at 1107.

Perhaps the most interesting question generated by the intersection of section 2–326 of the Code with the Bankruptcy Act is whether repossession or perfection of the consignor's rights within the four months before bankruptcy may constitute a voidable preference. It has generally been assumed that, at least in states having no relevant sign statute, repossession by a consignor involves no preference, because there is no transfer to or for the benefit of a creditor. [3 Collier ¶ 60.44 (1950).] A fair construction of the Code, it is believed, renders repossession, or any other mode of perfection against creditors of a selling factor, effected by a consignor within the four month period vulnerable as a voidable preference, provided, of course, the other elements required by section 60 of the Bankruptcy Act are present. The premise of section 2–326(3) of the Code is that, so far as creditors of a dealer not generally known to be selling the goods of another are concerned, delivery of goods to him on consignment effects a transfer subject to the right of return. A return, though rightful under the terms of the assumed arrangement, is nonetheless a transfer to one standing in the position of a creditor. [Footnotes omitted.]

A similar result was proposed by other commentators where a consignor filed a financing statement to perfect his interest within four months before bankruptcy as to goods already on the premises of the consignee. King, Current Problems in the Sales Area, 2 U.C.C. Law Journal 228, at 236–237 (1970).

If section 70(e) applies, the rights of the intervening creditor pass to the trustee in bankruptcy. The trustee, by asserting that the consignor's filing was too late to cut off the rights of the creditor, would then prevail over the consignor. King, Voidable Preferences and the Uniform Commercial Code, 52 Cornell L.Q. 925, 937 (1967).

Also, Dusenberg, 2 Valparaiso University Law Review 227 (1968), at 261:

Furthermore, as long as the consignor has failed to satisfy one of the notoriety provisions of Section 2–326(3), the consignee also has certain interests which are subject to his creditors' claims. Indeed, by legislative fiat, the true consignment is then converted to a sale or return as to claims of the deliveree's creditors. Conceivably, when

there is a tardy filing, the true consignor's retained title might be equated to a security interest and thus qualify as a transfer defined in the Bankruptcy Act.

These arguments seem equally applicable in cases where goods are in the consignee's possession and the rights of the consignor are attempted to be protected by repossession or return. As Dean Hawkland points out, filing (§ 9-302) and taking possession (§ 9-305) are only alternate methods of perfecting a security interest. Hawkland, 67 Com. L.J. 146, 148 (1962). If one method of late perfection (i. e. filing) constitutes a voidable preference, logic dictates that late perfection by repossession within four months of bankruptcy would likewise have the same effect.

Section 60(a) (1), 11 U.S.C.A. § 96(a) (1) defines preferences:

> A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

Also, Section 1(30), 11 U.S.C.A. § 1(30) defines transfer as:

> "Transfer" shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof * * * as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor.

The return of goods which were subject to creditors' claims while in the debtor's possession was a "disposing of or parting with * * * the possession thereof" as well as the "power to transfer" them under N.J.S.A. 12A:2-403. This § 60(a) "transfer" was for the benefit of a "creditor" (§ 1(11) of the Bankruptcy Act), as there is no question from the schedules herein that Estey is also a general creditor with unsecured claims of over $50,000.00 "provable in bankruptcy." There is no showing that the return was made for present consideration; in fact, the return was credited to an antecedent debt. The Referee's findings also state that "During all of 1968 the liabilities of Gross exceeded its assets." It is clear that in April 1968, Gross was insolvent within the definition of § 1(19) of the Bankruptcy Act (11 U.S.C.A. § 1(19)). Farmers Bank of Clinton, Missouri v. Julian, 383 F.2d 314 (8 Cir. 1967), cert. den. 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967). There can be no doubt that the effect of the transfer would be to permit Estey to "obtain a greater percentage of [its] debt than some other creditor", as the Trustee held approximately $30,000.-00 in assets (not including the subject of this litigation) while there are general unsecured claims of over $250,000.00. Therefore, if may be said that the transfer of goods on consignment (sale or return) back to Estey constituted a preference under § 60(a). See Collier, on Bankruptcy, 4A, ¶ 70.59 at 686-687 (14th Ed. 1969).

The rationale behind this holding is supported by decisions in states that had notice statutes. In Virginia Book Co. v. Sites, 254 F. 46 (4 Cir. 1918), the court held that a consignor who had not complied with the Virginia statute (notice by sign) received a preference when he repossessed goods in which he, as consignor, purportedly retained title. That court cited Chesapeake Shoe Co. v. Seldner, 122 F. 593 (4 Cir. 1903), where it was held that the failure to notify creditors as required by the state sign statute "avoids the title of the consignor and gives title to the trader." The

court in Virginia Book Co. v. Sites, supra, 254 F. at 48, went on to say:

> * * * it seems evident that the consignor could not as against creditors reinvest itself with title by taking possession of the property when the bankruptcy of the consignee was impending and the necessary effect of its act was to give it a preference. In other words, since the statute made these books, notwithstanding the concealed reservation of title, the property of the bankrupt quoad his creditors, the book company had no more right to them as against creditors than it had to any other property belonging to his estate.

Cf. Collier, Vol. 2, § 60.16, which questions whether the consignor in Sites was actually a "creditor", as Estey clearly is in the present case.

Prior to the enactment of the Uniform Commercial Code, the issue of preference was rarely raised in that title to the goods was in the consignor, and reclamation from the trustee was permitted even where the goods were commingled with other goods on the premises of the bankrupt at the time of filing the petition. In re Prager, 173 F.Supp. 859 (D.N.H.1958); In re Lexington Appliance Company, 202 F.Supp. 869 (D.Md. 1962); Fowler v. Pennsylvania Tire Company, 326 F.2d 526 (5 Cir. 1954); cf. In re Edwards, 163 F.Supp. 935 (N. D.Cal.1958), wherein commingling was so great that reclamation was denied for the reason that identity of the consigned goods was lost.

The only post-Uniform Commercial Code located case which considers the present issue is Mann v. Clark Oil & Refining Corporation, 302 F.Supp. 1376 (E.D.Mo.1969), aff'd 425 F.2d 736 (8 Cir. 1970). That case involved, inter alia, the transfer to Clark of proceeds of sales, and inventory within four months of bankruptcy, which items were purportedly the property of the consignor under an agreement with the bankrupt to operate a retail gasoline and service station. The court held that the consignment was controlled by the state law (identical to N.J.S.A. 12A:2–326). Even treating the agreement in that action as a "true consignment", the district court stated that these pre-bankruptcy "transfers" back to Clark of items subject to creditors' claims under § 2–326(3) while in the dealer's possession would not permit Clark to "rely on its purported reservation of title to the gasoline." The proceeds "in trust" and the gasoline and other inventory on "consignment" had to be returned to the trustee as voidable preferences. The Court of Appeals affirmed in a short opinion. "Under these circumstances, pursuant to subsection three of the statute referred to above, the goods held by the bankrupt were subject to the claims of his creditors." 425 F.2d at 737. The district court also held, on alternative grounds, that the unfiled "consignment" was actually an unperfected security interest and that the return of proceeds and inventory under it constituted a preference.

Therefore, it is concluded:

(1) that this consignment constituted a "sale or return" as defined in N.J.S.A. 12A:2–326;

(2) that the agreement purporting to reserve title in the corporation making delivery does not make § 326 inapplicable under any of the exceptions under subsection (3);

(3) that goods held on sale or return were subject to claims of the buyer's creditors while in its possession as directed by § 326(2);

(4) that the return of goods within four months of the date of filing the petition constituted a transfer to a creditor as defined in § 1 of the Bankruptcy Act;

> (a) that the transfer was for the benefit of Estey;

> (b) that at the time of the transfer Estey was a creditor of Gross;

> (c) that at the time of said transfer Gross was insolvent and Estey had reasonable cause to believe that it was insolvent;

(d) that the assets of the bankrupt estate are insufficient to satisfy all of the claims of the creditors;

(5) that said transfer was preferential under § 60(a) (1) of the Bankruptcy Act, 11 U.S.C.A. § 96(a) (1); and

(6) that said preference is hereby declared void under § 60(b) of the Bankruptcy Act, 11 U.S.C.A. § 96(b).

Even based on the Referee's findings (but not his conclusions) and in light of the deficiencies in the actual consignment arrangement herein (e. g. billing upon shipment, requiring personal notes, commingling proceeds, mixing consigned goods with goods owned, setting of prices by the consignee and failing to keep proper accounts), it is also possible to conclude, as the court did in Mann v. Clark Oil & Refining Corporation, supra, that this consignment, while valid, was actually intended as a security interest. N.J.S.A. 12A:9–102(2):

This Chapter applies to security interests created by contract including * * * consignment intended as security.

Also, N.J.S.A. 12A:1–201(37) reads as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. * * * Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (12A:2–326).

■ Therefore, it may also be concluded that this consignment was intended to create a security interest. As the Referee found:

2. The balance-sheet position of Gross at this time left much to be desired. Estey was unwilling to deliver on open account the volume Gross required. However, Estey was willing to send on consignment the volume of merchandise Gross wanted.

This clearly shows that the intent was something other than a "true consignment" and was intended to make the creditor-supplier secure. On this basis as well, the Court finds that this return or repossession of goods held under an unperfected security interest was a preferential transfer which may be voided under the Bankruptcy Act.

Therefore the Trustee's counterclaim for the value of the goods preferentially transferred ($26,049.93) will be granted. This matter will be remanded to permit Estey to file a revised proof of claim including the amount of its unsecured claims for the value of the goods ($26,049.93) and repair work done thereon (the reasonable value of which the Referee found was $6,289.89). Accordingly, counsel for the Trustee will submit an appropriate order on notice to counsel for Estey or bearing such counsel's consent as to form.