**Norman L. NEWHALL, III, Trustee for Bobbie Ruth Snyder d/b/a Bobbie's, Debtor, Plaintiff-Appellant,**

v.

**Vicki HAINES, Roesellen Quamen, Carol Schmidt, Mary Ann Rosenquist, Mrs. Charles Volk, Linda Thrasher, Mel Meyer, Marta Barker, Karl Bauer, Dorothy Coates, Vivian Rohlk, Donna Olson, Defendants-Appellees.**

No. CV–80–129–GF.

United States District Court,
D. Montana,
Great Falls Division.

May 11, 1981.

Norman L. Newhall, III, Scott, Linnell & Newhall, Great Falls, Mont., for plaintiff-appellant.

John Paul, Great Falls, Mont., for defendants-appellees.

OPINION

HATFIELD, District Judge.

This is an appeal from an order of the Bankruptcy Court for the District of Mon-

tana, Great Falls Division. The trustee in bankruptcy appeals the decision denying its claim of title to certain personal property held on consignment by the bankrupt. This court has jurisdiction pursuant to 28 U.S.C. § 1334. For reasons contained herein the order of the Bankruptcy Court is AF-FIRMED.

The facts of this case are fairly set forth in the lower court's memorandum. They include the following:

"In February of 1977, Bobbie Ruth Snyder, hereafter referred to as "Bobbie" opened a business by that same name. It dealt mainly in gift items, gourmet foods, kitchen and bathroom effects and household items, all of a commercial nature and not handcrafted or individual antiques. Bobbie obtained financing for this inventory line from the Village Bank. The last advance made by the Bank was in January of 1979. Some six months later, in July of 1979, when Bobbie was having financial problems, she started taking in antiques and other such collectibles, on a consignment basis whereby she was to retain 25% of the amount received from the sale of such goods. There were some 26 persons who consigned items to her. In April of 1980, she held a going-out-of-business sale of the store, and there was a sign posted at the front door advertising 20% off on all items except consigned goods. On May 20, 1980 she filed petition in bankruptcy. At the time of this sale, she advised the bank officials that the store would be open in order for the consignors to pick up their goods. This arrangement was apparently satisfactory with the Bank, but with the requirement that a Bank official should be present to oversee the removal of the consigned items only. All other inventory was subject to security interest. Before the consignors could pick up the property, bankruptcy took place, the "antiques" have since been in the custody of the trustee, and this action resulted." Bankruptcy Court Order, p. 1.

In addition, the Bankruptcy Court found that before Bobbie began her consignment venture, the primary creditor, the Village Bank, was informed and approved her plans. Bobbie also took out a number of ads in the local papers soliciting antiques for consignment, thereby putting at least the local creditors on notice of the consignment business.

The court further found that there were two, almost unrelated, operations involved at Bobbie's:

The first was the normal commercial gift-boutique and gourmet shop, with a commercial inventory purchased in the normal business manner from wholesale dealers. These items were included in the Bank's security interest. The second venture is the one we are concerned with. These items did not come from national commercial sources, but were entirely local. Some were hand made and others were antiques of peculiar value, and furniture of individual condition. They were not standard inventory or commercial items. While the two operations took place in the same building, they were distinct and separate in both time and in nature.

Bankruptcy Court Order, pp. 3 and 4.

A review of the pleadings and documents in the file support these findings of fact; and both sides seem to be in agreement here, except as to the knowledge of the local creditors of the consignment operation. Since none of the facts set forth above is clearly erroneous they are adopted by the court. *Miguel v. Walsh*, 447 F.2d 724 (9th Cir. 1971); *Coen v. Zick*, 458 F.2d 326 (9th Cir. 1972); *In Re Houtman*, 568 F.2d 651 (9th Cir. 1978).

The issue here is what effect, if any, is the Montana Uniform Commercial Code, in particular § 30–2–326. M.C.A., on these facts. The statute states in pertinent part:

30–2–326. Sale on Approval and Sale or Return; Consignment Sales and Rights of Creditors.

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is . . .

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.

The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

(a) complies with an applicable law providing for consignor's interest or the like to be evidenced by a sign; or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(c) complies with the filing provisions of the Chapter on Secured Transactions (Chapter 9).

The official comment to this section makes it clear that the purpose of this section is to protect the creditors of the dealer who may be misled by the secret reservation of title to the consigned goods. The comment also suggests that the consignment transaction will be deemed a "sale or return" only "when the buyer [consignee] has a place of business at which he deals in goods of the kind involved." *See*, Comment 2 of § 30–2–326, M.C.A. *See also, In re Mincow Bag Co., Inc.*, 29 A.D.2d 400, 288 N.Y.S.2d 364, aff'd, 24 N.Y.2d 776, 300 N.Y. S.2d 115, 248 N.E.2d 26 (1968).

Here, if the transaction between the individuals (consignors) and the bankrupt (consignee) is characterized as a "sale or return", the items become subject to the buyer's creditors while in the buyer's possession, unless the requirements of § 30–2–326(3), M.C.A. are met. Thus, unless the consignor has satisfied the exceptions of subsection (3) or unless the section is inapplicable because the nature of the transaction is something other than a "sale or return", the trustee in bankruptcy gains title for the benefit of the bankrupt's creditors. *Vonins, Inc. v. Raff*, 101 N.J.Super. 172, 243 A.2d 836 (App.Div.1968); *In Re Levy*, 3 U.C.C. Reporting Service 291 (D.C. Pa.1965); *In Re Fabers, Inc.*, 12 U.C.C. Reporting Service 126 (Conn.1972); *Re Bankston*, 3 U.C.C. Reporting Service 345 (D.C. Ga.1966); *In Re Gross Mfg. & Importing Co.*, 328 F.Supp. 905 (D.C.N.J.1971). *See* generally 40 A.L.R.3d 1078.

■ This code provision brought about a change in the general law of consignments. The pre-code law was that a consignor could generally reclaim the goods against the consignee's creditors (and trustee). *Liebowitz v. Voiello*, 107 F.2d 914, 916 (2d Cir. 1939); 67 Am.Jur.2d, Sales, § 35; *Cf., State Tax Comm. of Arizona v. Martin*, 57 Ariz. 283, 113 P.2d 640 (1941); *See also*, White & Summers, Uniform Commercial Code (1972). Now, however, if an insolvent consignee "maintains a place of business at which he deals in goods of the kind involved ...", the goods in his possession become subject to the claims of his creditors absent compliance with one of the three exceptions.

The major justification of the enactment of this Code provision is that:

... Regardless of the legal theory of the consignment, in practical operation it looks like a sales transaction in which the unpaid seller retains a secret lien in his goods. From a creditor's point of view, the consigned goods appear to be part of the regular inventory of the consignee which, therefore, ought to be subject to their claims. What is more, unlike a pre-code chattel mortgage, there is no public filing or other notoriety respecting the consignment to warn the creditors that the consignor may have rights in the goods which are superior to theirs.

The Code drafters were apparently much impressed that the consignment situation could be terribly misleading to creditors of the consignee. So, while the Code permits the consignment transaction to continue, it declares that the consignment will be valid as against creditors only if there is some way by which creditors can learn of the consignment.[1]

It's clear the underlying purpose of § 30–2–326, M.C.A. is to eliminate the danger of third persons (e. g., creditors), being misled by the apparent ownership of goods held by the consignee.

With the foregoing facts established, and the law examined, the court turns now to a review of the Bankruptcy Court's legal conclusions. *See, Matter of Hammons*, 614 F.2d 399, 403 (5th Cir. 1980); *Matter of Pacific Far East Line, Inc.*, 458 F.Supp. 771 (D.C.Cal.1978).

The Bankruptcy Court concluded that the case was controlled by § 30–2–326(3), M.C.A. Furthermore, the Bankruptcy Court, after thorough inquiry, determined that subsection 3(b) applied since the bankrupt was "generally known by her creditors to be substantially engaged in selling goods of others." While this court agrees with the legal determination made by the Bankruptcy Court that the *local* creditors were generally aware of the consignment business for the purposes of § 30–2–326(3)(b) M.C.A., the court is first faced with the question of whether the nature of the transaction here can be classified as a "sale or return".[2]

Although there is no argument over whether various consignments existed be-tween the bankrupt and individuals, the real question is were these consignments transformed into a "sale or return" by operation of § 30–2–326(3). In this court's view, they were not. Bobbie's consignments are not transactions which are governed by the statute.

The crucial language is in § 30–2–326(3). There, it states that "[w]here goods are delivered to a person for sale and such person *maintains a place of business at which he deals in goods of the kind involved,* . . . then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return." (emphasis added.)

Without doubt, Bobbie's primary business since opening its doors in February, 1977, was the selling of gift-boutique items, gourmet foods, kitchen and bath effects and other household specialty items,[3] including new casual furniture. Her inventory financing and credit were extended only on this type of new commercial inventory. The suppliers were commercial wholesalers. In July of 1979, Bobbie's began its consignment venture. Its suppliers were individuals in the local area and not commercial dealers. Bobbie took out a number of ads in the local papers with large letters stating "Wanted Antiques on Consignment". Bobbie eventually took in certain handicrafts, antiques,[4] and used furniture, none of which was of a commercial nature or had the appearance of being part of the regular business inventory. The regular business suppliers of Bobbie's were commercial merchant dealers, whereas the suppliers for the

---

1. *Shanker*, Bankruptcy, and Article 2 of the Uniform Commercial Code, quoted in *In Re Gross Mfg. & Importing Co.*, 328 F.Supp. 905, 909 (D.C.N.J.1971).

2. Although the Bankruptcy Court did not address this question in its order, the issue was argued by the respondent in pleadings before the Bankruptcy Court and raised as an issue on appeal. Therefore it is properly before this court. *Matter of U. S. Financial, Inc.*, 594 F.2d 1275, 1281 (9th Cir. 1978).

3. It has been established that Bobbie's dealt primarily in gourmet and gift items including specialty coffees, teas, jelly, honey, spices, gift food packages, napkins, placemats, spice racks, toothbrush holders, soap trays, etc.

4. A review of the record here indicates that the owner of Bobbie's brought with her a few of her personal antiques mostly for display purposes, but some for sale. The court finds that these sales were but isolated incidents not qualifying the owner of Bobbie's as a regular dealer engaged in the business of selling goods of that kind within the meaning of § 30–3–326 M.C.A. *See* affidavit of Bobbie Snyder dated September 17, 1980.

consignment business were individuals from the local area.

While Bobbie's consignment business and specialty shop might have shared the same building, the operations and the goods sold of each business were separate and distinct. Thus the court finds that the consigned goods were different in nature from the regular inventory.

The court having concluded that the nature of the goods involved in each operation was not the same, the prerequisite of subsection (3) is not met. Thus, the transaction is not a "sale or return" as that term is defined but rather a true consignment.

■ Where the nature of the transaction is a true consignment, title to the merchandise remains with the consignor and does not inure to the benefit of the consignee's creditors or the bankrupt's trustee. *Allgeier v. Campisi*, 117 Ga.App. 105, 159 S.E.2d 458 (1968); *In re Griffin*, 1 UCC Reporting Service 492 (1960); *In re Mincow Bag Co., Inc.*, 29 A.D.2d 400, 288 N.Y.S.2d 364, aff'd 24 N.Y.2d 776, 300 N.Y.S.2d 115, 248 N.E.2d 26 (1968). The consignment transactions here, in the court's view, are not governed by the provisions of § 30–2–326 M.C.A. Moreover, the creditors of Bobbie's are not prejudiced since due to the type and kind of the items consigned, the creditors were not misled into thinking the goods were part and parcel of Bobbie's regular commercial inventory.

The court has ruled as a matter of law that under these facts § 30–2–326 M.C.A. does not apply because the consignee did not maintain "a place of business at which he deal[t] in goods of the kind involved."

The ruling here disposes of the need to consider whether the consignor complied with § 30–2–326(3)(b), M.C.A.[5]

Accordingly, the conclusion of the Bankruptcy Court that title to these consignment goods remain with the consignors is AFFIRMED.

---

**5.** If the court were called upon to do so, it would agree with the conclusion made by the Bankruptcy Court that the consignor complied with § 30–2–326(3)(b) under a liberal interpretation and in furtherance of the policy and purpose of the section. *See,* § 30–1–102(1), M.C.A. While it may be true that not *all* creditors of Bobbie's knew of the consignment business so as to literally comply with § 30–2–326(3)(b), nevertheless the court rejects this narrow technical interpretation because it would have the effect of granting a preference to creditors who were never misled. Thus the danger at which this section is intended to eliminate did not exist under this factual setting, unlike the factual settings before the courts in cases cited by appellant.

Moreover, the primary creditor (Village Bank), which had the security interest in the inventory of Bobbie's, was found to have had actual knowledge of the consignment business. The last credit extended by the Bank was in January of 1979 while the consignment venture began in July of that year. The credit was extended only on the commercial inventory. Since the Bank had knowledge of the consignment business it cannot claim it was misled by any secret reservation. Where a secured creditor knows the goods rightfully belong to the consignor, the consigned goods are not subject to the claims of the consignee's creditors by operation of § 30–2–326(3). *See, GBS Meat Industry PTY. LTD. v. Kress-Dobkin Co.*, 474 F.Supp. 1357, 1362 (W.D.Pa.1979). Any other construction under these circumstances would subvert the intent of § 30–2–326 M.C.A. and sanction intentional conversion.

In addition the Bankruptcy Court found, and it is not contested here, that the other creditors extended their credit long *before* the consignment operation began. It appears that no one extended credit upon the appearance that these consigned goods were indeed owned by the business. Thus, any contention that the creditors of Bobbie's may "reasonably be deemed to have been misled by the secret reservation" is rejected by the court. Since the clear import of this statute is to protect misled creditors, the statute's purpose will be furthered and equity done by upholding the Bankruptcy Court's ultimate ruling.