39 B.R. 912 (1984)
In re P.M.R.C. CORPORATION, Debtor.
P.M.R.C. CORPORATION, Debtor, Plaintiff,
v.
CRESCENT JEWELRY & RARE COIN COMPANY, INC., Defendants.
Bankruptcy No. 183-31185, Adv. No. 183-0398.
United States Bankruptcy Court, E.D. New York.
June 6, 1984.
Platzer & Fineberg, New York City, Steven Karlin, Bayside, N.Y., for PMRC Corp.
Fred C. Mather, Phoenix, Ariz., for Crescent Jewelry & Rare Coin Co.
Otterbourg, Steindler, Houston & Rosen, Mark A. Neporent, New York City, for Creditors' Committee.

OPINION
CECELIA H. GOETZ, Bankruptcy Judge:
This is an adversary proceeding brought by the Debtor-in-Possession, P.M.R.C. Corporation ("PMRC"), against Crescent Jewelry and Rare Coin Company, Inc. ("Crescent") to recover a preference.

FINDINGS OF FACT
PMRC is engaged in the business of refining and selling gold and precious metals. Crescent is one of its creditors. Answer, par. 4. Crescent is located in Scotsdale, Arizona.
Around February 16, 1983, following a conversation between Gerald Burlock, the President and sole stockholder of PMRC, and Mr. Michael Golonka, President of Crescent, Crescent shipped to PMRC 500 ounces of pure gold in the form of five gold bars and some shot. Tr. 4/11/84 at 5-8; P.Ex. 3. Mr. Burlock and Mr. Golonka spoke to each other almost daily regarding *913 how the business of each was doing. Prior to the February shipment, Mr. Burlock had told Mr. Golonka that he was having cash flow problems and was asking persons to whom he had issued checks to withhold depositing them as he lacked the money to cover them. Tr. 4/11/84 at 6-7, 42.
The gold was shipped on the understanding that PMRC would return it at the end of May and that interest would be paid monthly at the rate of 18% per annum. Id. at 9. In accordance with that agreement PMRC sent Crescent 7½ ounces of pure gold every month. Ibid.
Mr. Burlock testified variously that Mr. Golonka told him that "[he] can do with what [he] wishes with the gold", (Tr. of 4/11/84 at 8) and that he was to hold it "pending further instructions from Crescent". (Tr. 4/11/84 at 25). Later he said that what Golonka told him was "I'm shipping it to you. Do with [it] what you wish. I may ask you to do certain things later". Tr. 4/11/84 at 43.
In early February the price of gold was around $500 per ounce.
When PMRC received the 500 ounces of gold from Crescent it sent it to the Republic National Bank of New York to be converted into cash and had the cash deposited in PMRC's account. Tr. 4/11/84 at 9-22, 36-37. Burlock may have told Mr. Golonka that he was going to do this. Id. at 37.
On PMRC's books and records it carried the 500 ounces on the consignment account of Crescent. Id. at 25-27. In the past other metals had been sent PMRC on consignment by Crescent. Ibid. When Mr. Burlock was asked whether the shipment was a loan or not, he stated that he was unable to answer the question. Id. at 46-47.
At the end of May, 1983 PMRC shipped 500 ounces of gold to Crescent in the form of five bars. Id. at 15. This was not the same gold as it had received; gold is fungible. Id. at 24.
In the "Settlement Report" prepared by PMRC covering the May 31, 1983 shipment, PMRC noted that the gold returned "on consignment" left Crescent with a balance of 8.95 ounces, described as "your current long gold". Def.'s Exh. B. The gold was received by Crescent in Scotsdale on June 3, 1983. P.Ex. 2.
On June 3, 1983 the price of gold was $411.50 per ounce of which the Court takes judicial notice with the consent of the parties. Id. at 15-17.
PMRC filed for relief under Chapter 11 of Title 11 on June 14, 1983.
PMRC's liabilities are between $900,000 and $1,000,000. Its assets have a value of not more than $600,000. Id. at 17-20. If PMRC were liquidated its creditors would be paid back less than 67% of what is owed them. The value of the gold returned to Crescent on June 3, 1984 represents a higher percentage of the value of the gold shipped in February to PMRC than what Crescent would receive on account of the latter shipment if PMRC were liquidated.

DISCUSSION
11 U.S.C. § 547(b) authorizes a trustee in bankruptcy (which includes a debtor-in-possession, like PMRC) to avoid any transfer of property (1) to a creditor, (2) on account of an antecedent debt, (3) made while the debtor was insolvent, (4) within 90 days before the date of the filing of the petition, and (5) which enables such creditor to receive more than such creditor would receive, if the case were a case under Chapter 7, the transfer had not been made and the creditor received payment of such debt under the distributive provisions of the Code. The trustee's burden of proof is eased by Section 547(f) which provides that "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition".
Crescent offered no evidence respecting the issue of insolvency. Therefore, PMRC must prevail on that issue, the third element of a preference. Rule 301 of the Federal Rules of Evidence; In re Butler, 3 B.R. 182, 185 (Bkrtcy.E.D.Tenn.1980); Matter of Briarbrook Development Corp., *914 11 B.R. 515, 519 (Bkrtcy.W.D.Mo.1981); In re Cosmopolitan Aviation Corp., 34 B.R. 592, 594 (Bkrtcy.E.D.N.Y.1983).
The evidence also establishes beyond peradventure that the first, fourth and fifth elements of a preference referred to above are present. Five hundred ounces of gold were transferred to Crescent within 90 days of the filing of petition, giving it more than 80% of what was due it, which is substantially more than it would receive if PMRC were liquidated.
Although Crescent put in no evidence its examination of Burlock indicates that it disputes the existence of the second element of a preference: the existence of an antecedent debt. Its position, to the extent that it can be deduced from its cross-examination, appears to be that the earlier delivery to PMRC of the precious metal was a consignment and did not create a debt.
In fact, it makes no difference  so far as the preference law is concerned  whether the February 13 shipment was a sale, a loan or a consignment. In any event, the return of that gold, even if it were the original gold that had been received and even if it had been sent to PMRC on consignment, would constitute a preference. See In re A.J. Nichols, Ltd., 21 B.R. 612 (Bkrtcy.N.D.Ga.1982); In re Gross Manufacturing & Importing Co., 328 F.Supp. 905 (D.N.J.1971); New York Uniform Commercial Code § 3-326(3); Toys Galore, Inc. v. Bush, 108 Misc.2d 200, 437 N.Y.S.2d 227 (Suffolk County Court, 1981).
But it is clear that, whatever the parties chose to label the transaction and however it was carried on PMRC's books, the 500 ounces were not consigned to PMRC for sale, with Crescent retaining title, but were transferred absolutely to PMRC. PMRC's obligation was to repay a loan; not to return the gold or the proceeds from the sale of that gold.
As soon as PMRC received the gold from Crescent it converted that gold to cash which it put in its own bank account. (That this disposition was consistent with the agreement with Crescent is indicated by the fact that PMRC's President, Burlock, may very well have advised Crescent's President that this is what he was going to do with the gold.) It is clear from PMRC's actions that what it committed itself to do was not to sell the gold on Crescent's behalf, but to return the same quantity on a fixed date and to pay interest on it in the interim. On the agreed upon date, PMRC returned what it had borrowed.
Except that the transaction involved gold, not currency, it conforms exactly to the pattern of a traditional commercial loan with a fixed date of repayment, plus interest for use during the term of the loan.

CONCLUSIONS OF LAW
When PMRC sent Crescent 500 ounces of gold on May 31, 1983, which was received on June 3, 1983, it was satisfying an antecedent debt created on February 17, 1983. The trustee has satisfied his burden with establishing all the elements of avoidable preference.
Accordingly, the trustee is entitled to judgment against the defendant in the amount of $205,575.00.
SO ORDERED. SETTLE JUDGMENT.