In re ATECO EQUIPMENT,
INC., Debtor.

KOENIG INCORPORATED, Plaintiff,

v.

ATECO EQUIPMENT, INC., Defendant.

Bankruptcy No. 81–2981.
Adv. No. 81–1979.

United States Bankruptcy Court,
W. D. Pennsylvania.

Jan. 20, 1982.

Ralph H. German, Pittsburgh, Pa., for plaintiff.

Sanford M. Lampl, Mary Ann McKeen, Pittsburgh, Pa., for debtor/defendant.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

### INTRODUCTION

The issues before this Court are twofold. The first is whether a shipper of goods pursuant to a consignment agreement can recover those goods from the consignee after the consignee files Bankruptcy. The second is whether a Debtor in Possession has the same rights in those goods as would a Trustee in Bankruptcy.

### HISTORY OF THE CASE

Koenig Incorporated (hereinafter "Koenig" or "Plaintiff") is a Texas corporation engaged in the manufacture and sale of motor truck equipment consisting of side boxes, tool boxes, service bodies with or without cranes, winches and similar items. Ateco Equipment, Inc. (hereinafter "Ateco" or "Debtor") is a Debtor in Possession under Chapter 11 of the Bankruptcy Code having filed its Petition for Relief on November 4, 1981. Ateco is an installer and seller of the goods manufactured by Koenig. Ateco sells these goods at wholesale and retail and installs these goods on trucks brought to its facilities by third parties. Ateco and Koenig entered into an agreement called "Warehouse Agreement" on September 14, 1979.

Pursuant to the terms of the agreement Koenig would ship goods to Ateco for resale. The goods, upon receipt by Ateco, were supposed to be segregated and marked as Koenig's goods. The agreement contemplates sales to Koenig's customers and Ateco's customers. The agreement states at paragraphs 4 and 5:

4. *Sale of Goods by Manufacturer*: It is understood and agreed by the parties hereto that Manufacturer contemplates sales of the goods warehoused hereunder to its customers; therefore, it is agreed by and between Manufacturer and Warehouseman that Warehouseman will release and deliver (as "delivery" is defined in paragraph 3(b) above) to Manufacturer's customers such quantities of the goods warehoused hereunder as shall be from time to time directed by Manufacturer pursuant to the following procedures:

(a) Manufacturer shall hereafter furnish to Warehouseman a list of its customers ("authorized customers") who are authorized to obtain goods from the quantities thereof warehoused hereunder by issuance of purchase orders to Warehouseman, and such authorization shall continue until such list is amended in writing by Manufacturer.

(b) In the event Warehouseman receives a purchase order from a person other than an authorized customer, it shall promptly so notify Manufacturer in writing, and shall either deliver goods pursuant to such purchase order or reject the same as thereafter directed by Manufacturer in writing.

(c) Warehouseman shall, within twenty-four (24) hours after the delivery of any of the goods warehoused by it pursuant to any purchase order, notify manufacturer in writing of such delivery, and shall attach to such notice the purchase order and written proof of shipment specifying by serial or other Manufacturer's identification number the goods delivered pursuant to such purchase order. Upon receipt by Manufacturer of the above notice, Manufacturer shall release in writing the warehouse receipt covering the goods so delivered by Warehouseman.

5. *Consideration for Warehouseman's Services*: In consideration of the warehousing of the goods and other services to

be rendered by Warehouseman hereunder, Warehouseman shall have the right to purchase all or part of the goods warehoused hereunder by issuing purchase orders therefor subject to the following terms and conditions:

(a) Warehouseman shall forward to Manufacturer its purchase order and proof of delivery to itself as provided in paragraph 4(c) above, and shall thereupon be entitled to take possession of the goods covered by the purchase order; provided, however, that title to such goods shall not pass from Manufacturer until such time as the goods are actually removed from Warehouseman's premises or payment therefor is received by Manufacturer.

(b) Warehouseman shall pay for the goods obtained by it pursuant to the provisions of subparagraph (a) above within thirty (30) days after the date of each such purchase order, at Manufacturer's then prices for such goods, but subject to Manufacturer's quantity discount regardless of the quantity of the goods obtained pursuant to any such purchase order.

The Warehouse Agreement not only contemplates that title to all the goods shall be in Koenig (paragraph 3 of the Warehouse Agreement) but further that Koenig shall have a security interest in those goods.

6. *Security Interest*: Notwithstanding Manufacturer's reservation of title to the goods warehoused hereunder, Manufacturer shall have a security interest in all of such goods at any time located upon warehouseman's premises, and pursuant to such security interest shall have all of the rights of a secured party as provided by the Uniform Commercial Code of the State of Texas. In connection with such security interest, Manufacturer and Warehouseman have executed a financing statement covering all of the goods located upon warehouseman's premises and the proceeds arising from the sale of any of such goods by Warehouseman, which shall be filed by Manufacturer as required by the aforesaid Uniform Commercial Code and maintained in full force

and effect throughout the existence of this Agreement.

Upon the date of the filing of the Bankruptcy, Ateco had in its possession goods shipped by Koenig having an approximate value of $25,000.00. In addition, Koenig had an open account receivable with Ateco of approximately $37,000.00. Koenig filed this complaint to recover the goods in Ateco's possession. The Plaintiff has advanced three theories for its position: (1) that the Uniform Commercial Code ("U.C. C.") section on consigned goods is not applicable under the facts before the Court, (2) that Koenig is not adequately protected and therefore is entitled to relief from the Automatic Stay imposed by Section 362 of the Bankruptcy Code, and (3) that even if its security interest is unperfected it has an interest in the goods superior to all except secured parties and that the Debtor in Possession cannot oust Koenig from its position because it cannot be considered a lien creditor without knowledge.

## DISCUSSION

The law of consignments under the Uniform Commercial Code is one of first impression for this Court. The problem presented here is both a problem under the Uniform Commercial Code and one under the Bankruptcy Code. The Court will examine the Uniform Commercial Code problem before looking at the rights of a Debtor in Possession. However, first the issue of the choice of laws must be examined.

### (A) *Choice of Laws*

A federal court will apply the substantive law of the appropriate state. The question before this Court is whether Texas or Pennsylvania law would apply. The Debtor is a resident of Pennsylvania and the contract between the parties calls for performance in Pennsylvania. However, the agreement itself calls for the law of Texas to control the application of the Uniform Commercial Code. We must apply the appropriate conflict of laws rules of the forum state, in this case Pennsylvania, to make the determination. Moore, Vestal and Kurland *Moore's*

*Manual-Federal Practice and · Procedure*, 307 (1981) citing *Montgomery Ward and Co. v. Pacific Indemnity Co.*, 557 F.2d 51 (3rd Cir. 1977).

 The Pennsylvania conflict of law rule is that in Bankruptcy the construction of a contract must be determined by local law. 8 P.L.E. Contracts 167 (1971) citing *In re Hartdagen*, 189 F. 546 (D.C.M.D.Pa.1911). Thus Pennsylvania law would govern in this case.

### (B) *The Uniform Commercial Code*

There are two issues presented to the Court under the U.C.C. The first is whether Section 2326 is applicable in this situation. The second is whether there was an intent to create a security interest in the disputed goods, and even if Section 2326 is found not to be applicable, whether that security interest needs to be perfected under Article Nine of the U.C.C.

### (1) *Consignment Sales*

 Section 2326 of the U.C.C. (13 Pa.C. S.A. § 2326) states as follows:

(a) Definitions—Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

(1) a "sale on approval" if the goods are delivered primarily for use; and

(2) a "sale or return" if the goods are delivered primarily for resale.

(b) Rights of creditors of buyer generally—Except as provided in subsection (c), goods held on approval are not subject to the claims of the creditors of the buyer until acceptance; goods held on sale or return are subject to such claims while in the possession of the buyer.

(c) Consignment sales—Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery:

(1) complies with an applicable law providing for interest of a consignor or the like to be evidenced by a sign;

(2) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(3) complies with the filing provisions of Division 9 (relating to secured transactions).

Even though the consignor reserves certain rights to himself in the underlying agreement, the agreement will not be controlling should the statute apply.

Koenig, however, argues that Section 2326 does not apply in this situation. Koenig agrees that the goods were not goods for sale on approval and that it is not exempt from Section 2326 by virtue of a sign law, knowledge of the other creditors or complying with Article 9 of the U.C.C., but Koenig states that Ateco did not maintain a business in which it dealt "in goods of the kind involved." Koenig reaches this conclusion because it claims its goods were not held primarily for resale by Ateco but were incorporated in products manufactured by Ateco. Koenig offered testimony that its truck bodies were painted and bolted to truck chassis belonging to Ateco's customers. Koenig further established that Ateco only charged one price for the finished product. Koenig concludes that since the goods as sold by Ateco were transformed by a manufacturing process after delivery by Koenig, Section 2326 does not apply.

Before dealing with the substance of Koenig's argument, the Court notes that Ateco also sold at retail a small amount of the goods delivered by Koenig and that Ateco installed, without modification, some goods delivered by Koenig.

The Court has not been cited to any cases from Pennsylvania or other states which support Koenig's position. In the case of *General Electric Co. v. Pettingell Supply Co.*, 2 U.C.C.Rep.Serv. 184 (Mass.1964), the question before the Court was whether a consignor ("General Electric") could reclaim from an assignee for the benefit of creditors commercial and industrial lamps which had been delivered for sale to the consignee ("Pettingell"). General Electric argued, *inter alia*, that because Pettingell sold other electrical items and only sold the lamps after revealing its agency with General Electric those lamps should be returned. The Court stated:

> The judge found that Pettingell maintained a place of business in which it dealt in goods of the kind involved, under a name other than the name of the Plaintiff. The Plaintiff's attack on this finding is based on the claimed absence of evidence that Pettingell sold any General Electric large lamps in its own name without disclosing its agency. We think the finding is supported by the evidence that Pettingell sold other electrical merchandise including other items from the plaintiff. The statute in referring to "goods of the kind involved" does not restrict the relevant business to dealings in the precise kind of electrical goods. Pettingell was a wholesaler "buying and selling electrical, hardware and housewares merchandise." *General Electric Co. v. Pettingell Supply Co.*, supra at 187–188.

There was no testimony that any "agency" relationship between Ateco and Koenig was revealed at the time of Ateco's sale of the goods manufactured by Koenig. It would appear that Koenig's attempt to exempt itself from Section 2326 based on its manufacturing argument cannot be supported. However, should the Court decide that Section 2326 does not apply in the instant situation, the question of whether or not there was an intent to create a security interest would need to be answered.

(2) *Security Interests*

A security interest is defined in Section 1201 (13 Pa.C.S.A. § 1201) as follows:

> A security interest means an interest in personal property or fixtures which secures payment or performance of an obligation.

Article Nine of the Uniform Commercial Code applies to a consignor who intends to create a security interest.

> This division applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factors lien, equipment trust conditional sale, trust receipt, other lien or title retention contract and lease or *consignment intended as security.* 13 Pa. C.S.A. § 9102(b). (Emphasis added.)

The *Warehouse Agreement* was drafted by Koenig and at paragraph 6, quoted above, states "notwithstanding Manufacturer's reservation of title. Manufacturer shall have a security interest in all of such goods." These words evidence Koenig's intent to create a security interest. Further, the language of paragraph 6 appears to establish that if Koenig's ownership interest was defeated, its security interest would survive. There appears a clear intent to create a security interest but no attempt to perfect that interest.

White and Summers in their treatise on the Uniform Commercial Code analogize a consignment of goods to inventory financing through the device of "floor planning."

> One familiar with "floor planning", that is the device whereby a seller or lender finances a retailer by taking a security interest in all of his inventory, should see the parallel between this process and consignment selling. Both are means of financing the retail seller's business with someone else's capital. That is to say, the manufacturer, wholesaler or lender has his capital tied up in the retailer's inventory and the retailer, who will get a slice of the proceeds, has his own capital thus freed for other purposes. A principal purpose of consignments is to finance the buyer and to maintain a kind of security interest in the seller . . .

Judges must still decide whether Article Nine applies to consignments by deciding

whether the parties "intended to create a security interest." In our opinion, courts should hold that a consignment creates a security interest at least if it is one that is functionally equivalent to a floor plan. James J. White and Robert S. Summers, *Uniform Commercial Code*, 886–87 (2nd Edition 1980).

It is the Court's opinion that from the very language of the agreement between the parties there was an intention to create a security agreement. The fact that this arrangement has a functional equivalence to "floor planning" makes the necessity for the filing of a financing statement even more compelling.

The 1972 amendments to the Uniform Commercial Code include a section in Article Nine specifically dealing with consignments not intended as security interests. This amendment has been adopted in Texas but not in Pennsylvania. Section 9–114 provides that a consignor who has no intent to create a security interest in the consigned goods and who is required by Section 2–326(3)(c) to file a financing statement to perfect his interest in the consigned goods has priority over other properly perfected inventory financers who are given proper notice of the consignment. This section is similar to Section 9112(3) with respect to notice of purchase money security interests which has been adopted in Pennsylvania.

The 1972 amendments carry further the scheme of the Uniform Commercial Code to give notice to third parties of secured interests in property. If this notice is not given, third parties who extend credit and secure inventory have a right to expect that they will have a superior position to those ownership interests in property of which they have not been properly notified by a U.C.C. filing.

Presumably some lawyers for consignors persist in the erroneous belief that the code did not alter the rights of consignors. Under pre-code law, a consignor could generally retrieve the goods against the consignee's creditors (and trustee) even though, as one judge pointed out, the consignor's interest is a "secret lien against creditors ... as harmful as an unfiled chattel mortgage or conditional sale." *Liebowitz v. [Voiello] Voidlo*, 107 F.2d 914, 916 (2nd Cir. 1939) But today Article Nine requires that the consignor file a financing statement for a security consignment, and virtually all goods on consignment, whether for security or not, are subject to claims of the consignee's creditors if the consignor does not comply with the public notice requirements of 2–326(3). Thus the code draftsman all but abolished the consignor's "secret lien." James J. White and Robert S. Summers, *Uniform Commercial Code*, 765–66 (1st Ed. 1972).

(C) *The Bankruptcy Code*

(1) *Rights of the Debtor in Possession*

■ The Plaintiff argues that under the Uniform Commercial Code an unperfected security interest is only subordinate to a lien creditor without knowledge of the security interest. 13 Pa.C.S.A. § 9301(a)(2). The definition of a lien creditor under the Uniform Commercial Code is found at 13 Pa.C.S.A. § 9301(c):

A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for the benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest.

The Trustee in Bankruptcy *represents* all the creditors, so unless all the creditors had knowledge of the security interest, the Trustee, even though he had personal knowledge, is given the status of a lien creditor without knowledge.

■ Under Bankruptcy Code Section 1107 the Debtor in Possession is given all the rights and duties of a Trustee under Chapter 11 with certain exceptions with

**236**

regard to investigation. These duties are not only those specified in Section 1106 but those duties specified in Chapters 1, 3 and 5 of the Bankruptcy Code which are made applicable to other chapters of the Code by Section 103(a). *Collier on Bankruptcy,* § 1107–3 (15th Ed. 1981). Thus the Debtor in Possession can set aside an unperfected security interest pursuant to Section 544(a)(1) of the Bankruptcy Code which states:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the Debtor that is voidable by

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time, and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such creditor exists;

It is clear that the Debtor in Possession would have the same powers as a Trustee and that a Trustee could void the unperfected security interest of Koenig.

(2) *The Automatic Stay*

 Koenig argues in addition, however, that despite the standing of its security interest, it is entitled to a modification or lifting of the automatic stay imposed by Section 362 of the Bankruptcy Code. Koenig asserts that it is a party in interest and thus entitled to the relief requested. However, Section 362(d)(1), on which Koenig relies, specifically states the reason for granting relief from the stay:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

The Court has decided that while Koenig may have had an interest in the specific goods before the Bankruptcy filing superior to the *Debtor* [see (B)(1)], it does not have an after the filing interest in the specific property superior to the *Debtor in Possession.*

CONCLUSION

We conclude that the Bankruptcy Code provides that the Debtor in Possession has the powers of a Trustee in voiding unperfected liens. Further, Koenig has failed to demonstrate that it is exempt from the consignment provision of the Uniform Commercial Code and it has failed to perfect a security interest in the goods even though it intended to create a security interest in those goods.